## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RUTH A. LEE,<br><br>        Plaintiff,<br><br>v.<br><br>KENNETH L. SALAZAR,<br><br>        Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>2:06-cv-977 CW<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

Plaintiff Ruth A. Lee ("Lee") asserts claims based on sex and age discrimination. In particular, she asserts claims for disparate treatment, hostile work environment, retaliation, Equal Pay Act violations, and constructive termination. The parties have filed cross-motions for summary judgment. For the reasons discussed below, the court denies Lee's motion for summary judgment. The court also denies Defendant Kenneth L. Salazar's[1] motion for summary judgment on Lee's retaliation and Equal Pay Act claims. It grants Salazar's summary judgment motion on Lee's disparate treatment, hostile work environment, and constructive termination claims.

---

[1] In her complaint, Plaintiff named Dick Kempthorne, in his official capacity as Secretary of Interior. Since that time, Kenneth L. Salazar has been named as Secretary of Interior and has been substituted automatically as the proper party. Fed. R. Civ. P. 25(d) (2010).

# BACKGROUND

**Technician Training**

Lee started working for the Bureau of Reclamation (the "Bureau") as a Materials Engineering Technician ("Technician").[2] She was fifty-three at the time.[3] Subsequently, the Bureau hired Mark Peaslee ("Peaslee"), Tom Haws ("Haws"), and Steve Morgan ("Morgan") as Technicians. Steve Corless was the team lead and Wade Brackett was Chief.[4] As a Technician, Lee tested soil and concrete samples and the test results were reported to design engineers.[5] Most training was done on the job, and Lee asserts Corless had her train new employees.[6] Lee learned how to classify soils largely from reading a book.[7] Lee knew of no instance where other Technicians received training on soil classification that she did not receive.[8]

Lee asserts, however, that she was denied training based on her gender. In 2003, the Bureau sent Haws to a training in Denver, Colorado. No other Technician was allowed to go. Because Lee

---

[2] Second Amended Complaint, ¶ 6 (Dkt. No. 8).

[3] *Id.*

[4] Deposition of Wade Brackett, 7:1–2, 37:3–4 (Dkt. No. 36-4) (hereinafter "Brackett Depo."). The court notes that excerpts from the deposition testimony of Brackett, Corless, and Lee are spread throughout different exhibits. Accordingly, the court cites the docket number where the specific pages may be located.

[5] *Id.* at 110:4–111:16.

[6] Ruth Ann Lee Deposition, Vol. I, 37:4–18 (May 14, 2008) (Dkt. No. 36-6) (hereinafter "Lee Depo., Vol. I).

[7] *Id.* at 39:15–20.

[8] *Id.* at 41:9–42:11 (testifying that while Lee saw other Technicians in Corless's office, she had no information one way or the other about whether he was providing training to them).

had been at the Bureau longer than Haws, she believed they discriminated against her by not allowing her to go.[9] After she left her position as a Technician, a young man and a young woman were given training on how to operate an all terrain vehicle. Lee never received that training. In her deposition, Lee asserted her age did not have anything to do with what training she received.[10]

**Technician Grade Levels**

Lee also contends the other Technicians were promoted earlier than her due to her gender.[11] Lee was hired at a GS-04 level in December 2000. Seventeen months later, she was promoted to a GS-05 in May 2002. In May 2004, Lee was promoted to a GS-06 level.[12] In comparison, Haws was hired in June 2001 at the age of forty-four as an Engineering Aid. He started at a GS-01 level. In June 2002, Haws was promoted to a Technician position at a GS-04 level. He was promoted to a GS-05 level in September 2003 and to a GS-06 level in October 2004.[13] Morgan was hired as a temporary Laborer in May 2003, at the age of forty-eight. In April 2004, he obtained a permanent position as a Technician at a GS-04 level. He was promoted to a GS-5 level in April 2005.[14] Peaslee was hired as a Technician in October 2001, at the age of twenty-three. He also started at the GS-04 level. He then received promotions to the next higher GS level in October 2002, 2003, and 2004.

---

[9] *Id.* at 78:1–79:23 (Dkt. No. 57-1).

[10] *Id.* at 82:3–4.

[11] Ruth Ann Lee Deposition, Vol. II, 292:7–13 (May 15, 2008) (Dkt. No. 39-4) (hereinafter ("Lee Depo., Vol. II").

[12] *See* Declaration of Barbara A. Turner, ¶ 3 (Dkt. No. 36-1).

[13] *Id.* ¶ 6.

[14] *Id.* ¶ 7.

Thus, by October 2004, Peaslee was at a GS-7 level.[15]  This data is summarized in the following table, which is ordered based on the employee's date of hire as a Technician.

| Employee | Age When Hired | Hired as a Tech. at GS-4 Level | Promoted to a GS-5 | Promoted to a GS-6 | Promoted to a GS-7 |
|---|---|---|---|---|---|
| Lee | 53 | Dec. 2000 | May 2002 | May 2004 | n/a |
| Peaslee | 23 | Oct. 2001 | Oct. 2002 | Oct. 2003 | Oct. 2004 |
| Haws | 44 | June 2002 | Sept. 2003 | Oct. 2004 | n/a |
| Morgan | 48 | Apr. 2004 | Apr. 2005 | n/a | n/a |

Based on this data, all three men received promotions more quickly than Lee, although Haws did not advance as quickly as Morgan even though Haws was younger than Morgan.  Peaslee, the only Technician under age 40, is also the only Technician promoted to a GS-7 level during the relevant time period.  Consequently, even though he started after Lee, he surpassed her in pay.

Lee asserts she had more experience than her co-workers and that she knew as much as them.[16]  Before Lee started with the Bureau, she obtained experience in concrete inspection and testing.[17]  At the Bureau, she received training on how to calibrate the testing pot.  Otherwise, Lee testified she did not need further training on inspection and testing because she had done it for so long.[18]  Lee received an "Star Award" for her outstanding performance approximately three months

---

[15]  *Id.* ¶ 5.

[16]  Lee Depo., Vol. II, 292:20–22 (Dkt. No. 39-4).

[17]  Lee Depo., Vol. I, 42:12–19 (Dkt. No. 36-6).

[18]  *Id.* at 42:25–43:4.

after she started working for the Bureau.[19]  Several years later, Lee received a Group Star Award for work on a project,[20] and an individual award for the work she did on a watering project.[21]  Lee also received awards for promoting a safety program.[22]

When Peaslee was hired as a Technician, however, he also had prior work experience in the area and had been well trained. [23]  Additionally, he had been certified in nuclear gauge use and by the American Concrete Institute ("ACI").[24]  When testing concrete, contractors preferred Technicians who were certified by ACI.[25]  Thus, Technicians were assigned to projects based on their level of expertise and qualifications.[26]  Lee did not have ACI certification when she started at the Bureau, nor at anytime during her employment as a Technician.

**Work Place Environment**

Besides failing to train and promote her, Lee asserts the Bureau also had a pervasive

---

[19]  Letter (Mar. 1, 2001) (Dkt. No. 39-5).

[20]  Letter (Aug. 2, 2004) (Dkt. No. 39-5).

[21]  Award Certification (Oct. 4, 2004) (Dkt. No. 39-5).  The record also includes other awards that Lee received, but they appear to be awards she received after she transferred to the mail clerk position.  Consequently, they are not relevant to Lee's performance as a Technician.

[22]  *See e.g.*, Award Certification (Oct. 1, 2002); Award Certification (Sept. 29, 2003) (Dkt. No. 39-5).

[23]  Steve Corless Deposition, 15:20–21 (Dkt. No. 36-5) (hereinafter "Corless Depo."); Brackett Depo., 37:10–19 (Dkt. No. 36-4).

[24]  Corless Depo., 15:21–24; Brackett Depo., 37:10–19.

[25]  Brackett Depo., 111:20–112:5 (Dkt. No. 36-4).

[26]  *Id.* at 37:7–9.

environment of hostility, that Corless was a bully, and Brackett did nothing to stop him.[27]  Because contractors preferred ACI certified Technicians, Lee, Haws, and Morgan took the test for ACI certification in 2003 or 2004, and Peaslee took a re-certification test.  Prior to taking the test, Lee was assigned a field project and Haws and Morgan were assigned a lab project.[28]  The men quizzed each other on potential test questions and Corless helped them study, but Lee received no help because she was in the field.[29]

Ultimately, the three men passed the test, but Lee did not.[30]  Rather than admit she had failed the test, Lee lied and said she had passed it.[31]  When Lee did not provide her certificate, Corless ultimately called the testing center and learned Lee had failed.[32]  Lee asserts she lied about her test results because her work place was bad and she could not bear "to be humiliated any more or embarrassed or made the laughing stock of being the only one who didn't pass."[33]

In the past, when another woman named Kenna had failed the test, Lee testified that Corless and Brackett talked about "how stupid she was, how dumb she was."[34]  Additionally, a woman who

---

[27]  Lee Depo., Vol. I, 156:23–25 (Dkt. No. 36-6); Lee Depo., Vol. II, 256:16–24 (Dkt. No. 36-6).

[28]  Lee Depo., Vol. II, 335:3–13 (Dkt. No. 48-3).

[29]  *Id.* at 335:13–20.

[30]  Lee Depo., Vol. I, 44:11–15 (Dkt. No. 36-6).

[31]  *Id.* at 44:19–45:1.

[32]  *Id.* at 44:24–45:5.

[33]  *Id.* at 45:6–9.

[34]  *Id.* at 45:10–21.

did the budget and a man who worked in the lab also were called names behind their backs.[35] Corless and Brackett did this "all the time" because "[t]hey were just bullies, just bullies."[36] Because Lee did not want to be referred to in the same manner, she lied about her test results.[37]

According to Lee, Corless's hostility occurred in other ways as well. One example involved a calculation for a back splatter test. Because the soil and concrete samples that Technicians tested were for such projects as dams, canals, and bridge abutments, correct test results were critical.[38] Typically, the Bureau only allowed Technicians on a project if it knew the Technician's work likely would be accurate.[39] At one time, however, the Bureau sent Lee to do a back splatter test that she had never previously done.[40] Lee knew how to collect samples, but she did not know how to do the calculations once the samples were collected.[41] Corless, nevertheless, sent her on the job and told her to call him when she got to the calculations and he would walk her through them.[42] Despite not having training, Lee completed the analysis with his help, but it was "very embarrassing" to have people wait on the results while she called him.[43] Lee testified, however, that Corless also did a

---

[35] *Id.* at 156:16–23.

[36] *Id.* at 156:24–25.

[37] *Id.* at 45:16–18.

[38] Brackett Depo., 110:11–18, 111:3–8 (Dkt. No. 36-4).

[39] *Id.* at 112:12–16.

[40] Lee Depo., Vol. I, 66:8–11 (Dkt. No. 36-6).

[41] *Id.* at 67:4–19.

[42] *Id.* at 67:21–25.

[43] *Id.* at 68:6–21.

similar thing to Haws.[44]

Lee further testified that Corless was controlling and all of the Technicians were "watched like criminals and treated like children."[45] Lee asserts, however, that she was the "whipping post." At one point, Haws told Lee, "[i]f you leave . . . then I become the whipping post."[46] He would be the one that Corless picked on and treated poorly.[47]

As part of bullying her, Lee asserts Corless treated her differently than the other Technicians. He directed other Technicians not to help her when heavy pipe had to be moved on a project or when she hooked up a trailer to her pick-up truck.[48] When Corless believed that Lee did something wrong he would "scream" at her.[49] Yet, if one of the men did something wrong, particularly Peaslee, nothing would be done because Peaslee was the "golden child" in Corless's eyes.[50] An example of this, Lee stated, pertained to a test Brackett gave to the Technicians. Peaslee was caught cheating on the test and Corless told the other Technicians about his conduct.[51] No other action, however, was taken against Peaslee. Yet, when Lee and Haws had a hard time on the test, Corless and

---

[44] *Id.* at 68:2–6.

[45] Lee Depo., Vol. II, 253:8–16 (Dkt. No. 36-6).

[46] *Id.* at 253:24–25.

[47] *Id.* at 254:2–9.

[48] Lee Depo., Vol. II, 226:1–19 (Dkt. No. 48-3).

[49] Lee Depo., Vol. I, 119:19–24 (Dkt. No. 48-3).

[50] *Id.* at 119:19–24; Lee Depo., Vol. I, 75:5–7 (Dkt. No. 36-6).

[51] Lee Depo., Vol. I, 73:1–4 (Dkt. No. 36-6).

Brackett met with them and they "went over the test, mainly [with Lee]" and not with Haws.[52]

After Lee worked on a Provo River project one or two months, Corless asked her to check in with him before she left for the project each day. Corless did not make the same demand on any of the male Technicians.[53] A couple of days later, Corless called her into his office and "said, 'I thought I told you to come in in the morning *and* after work.'"[54] When Lee disagreed with him, Corless "jump[ed] up out of his seat," and started "screaming . . . 'Get out of here. Get out of here. Get out of here,' and chasing [Lee] out."[55] Lee stopped and asked him "why are you acting this way?"[56] At one point, Lee thought he was going to hit her.[57] Brackett and another co-worker heard Corless, but did nothing to stop the situation.[58]

Lee also asserts she was treated differently because Corless did not want her talking with visitors, but allowed her co-workers to do so.[59] Moreover, people who smoked or hunted were permitted more breaks and time-off than those who did not smoke or hunt.[60] Further, they did not

---

[52] *Id.* at 74:16–75:1

[53] Lee Depo., Vol. II, 221:21–23 (Dkt. No. 36-6).

[54] *Id.* at 217:5–6 (emphasis added).

[55] *Id.* at 217:7–10.

[56] *Id.* at 217:11–12.

[57] *Id.* at 217:15–18.

[58] *Id.* at 217:13–15.

[59] *Id.* at 210:14–21

[60] *Id.* at 254:16–25.

assign her to jobs requiring travel as frequently as other workers, so she was left in the lab.[61]   As a result, she lost out on overtime pay and per diem.[62]  Lee believes the lack of travel assignments was due to her gender and age.[63]

Brackett and Corless also treated Lee differently when they called her in for a review because her reviews lasted longer than other employees.  They discussed who did not like her and "everything [she] did, everything over and over."[64]  Consequently, Lee would cry and Brackett "would say, 'Oh, it's a grandma thing.  It's a grandma thing.'"[65]  Brackett started using the phrase about three times per week, but then it became daily.  Brackett used the phrase during Lee's reviews and in other meetings.  Lee believes Brackett used the phrase because she was older and cried a lot and not in reference to her job performance.[66]  Lee stated she cried "most of the time" because "[t]hey just wore me down."[67]

Lee asserts the bullying extended to others as well.  At one time, a young, "black man" worked for the Bureau "and they treated him so bad."[68]  According to Lee, because Brackett and

---

[61]  Lee Depo., Vol. II, 246:8–12 (Dkt. No. 48-3).

[62]  *Id.* at 318:2–12.

[63]  *Id.* at 246:13–247:10.

[64]  *Id.* at 212:19–23.

[65]  *Id.* at 212:24–25.

[66]  Lee Depo., Vol. II, 214:19–20, 215:12–17 (Dkt. No. 36-6).

[67]  *Id.* at 215:24–25.

[68]  Lee Depo., Vol. I, 157:8–9 (Dkt. No. 36-6).

Corless did not like him, nothing the man did was right and "they made sure everybody knew."[69] With regard to another young man, they also treated him poorly because he dressed differently and had "some piercings."[70] They further treated a younger woman poorly and a man who was Native American.[71] Lee testified they treated people poorly when they did not want them to succeed, and ultimately, they did not want her to succeed.[72]

Finally, Lee asserts that Corless had a screen saver on his computer of "half naked women."[73] Lee had to go to Corless's office frequently to ask him a question or to have him show her something. Consequently, she saw the screen saver often and "just got so tired and embarrassed when [she] would go in."[74]

**Initial Contact with Equal Employment Opportunity Office**

On February 25, 2005, Lee contacted the Bureau's Equal Employment Opportunity ("EEO") office and alleged that due to her gender she had experienced a "lack of timely promotion," a "lack of training," and harassment.[75] She also alleged some of the discrimination was based on age. Lee asserts that after she filed her grievance, "things really went bad," because she was then ignored by

---

[69]  *Id.* at 157:18–21.

[70]  Lee Depo., Vol. II, 209:1–5, 210:22–212:4 (Dkt. No. 36-6).

[71]  Lee Depo., Vol. II, 228:1–229:7 (Dkt. No. 48-4).

[72]  Lee Depo., Vol. II, 216:1–2 (Dkt. No. 36-6).

[73]  Lee Depo., Vol. II, 251:20–25 (Dkt. No. 48-4).

[74]  *Id.* at 251:24–25.

[75]  Second Amended Complaint, ¶¶ 24–25 (Dkt. No. 8).

everyone.[76] On March 21–22, 2005, the EEO office conducted a mediation between the parties, but it did not resolve the dispute.[77]

Also in February 2005, Lee was assigned to test soil samples from an Echo Dam project.[78] On eight samples from the project, Lee mistakenly dried them in the oven rather than by air.[79] The mistake delayed the test results on those samples five to seven days.[80] Lee told the EEO office that two days after the mediation, Brackett called her into his office and told her he was giving her a written reprimand due to the error.[81] Lee contends Brackett had never done that before to her or anyone else, and therefore Lee believes it was a result of her EEO complaint. Lee admits she never saw the reprimand, however, and no reprimand was put in her file.[82] Nor is there evidence that Lee received any other discipline for this error.[83]

---

[76] Lee Statement (May 25, 2005) (Dkt. No. 36-9).

[77] Declaration of Deborah M. Polak, ¶ 8 (Oct. 19, 2009) (Dkt. No. 36-8) (hereinafter "Polak Decl.").

[78] At the beginning of the Echo Dam project, Corless told Lee there would be no overtime. Lee Depo., Vol. II, 171:4–6 (Dkt. No. 36-6). Because the project was so large, Lee worked a couple of hours in the mornings on her "own time," without telling anyone. *Id.* at 171:9–14; Lee Depo., Vol. II, 300:1–3 (Dkt. No. 51-3). She never asked for overtime due to Corless's statement at the beginning of the project. Lee Depo., Vol. II, 171:17–20 (Dkt. No. 36-6). Lee has not asserted a claim regarding having to work without pay so these facts are not at issue in this dispute.

[79] *Id.* at 182:10–16.

[80] Lee Depo., Vol. II, 186:2–6, 22–25 (Dkt. No. 57-1).

[81] Lee Depo., Vol. II, 182:17–18 (Dkt. No. 36-6).

[82] *Id.* at 189:24–190:2.

[83] *Id.* at 190:1–2, 7–9; Plaintiff's Memo. in Opp'n to Def.'s Mot. for Sum. J., 16 (Dkt. No. 44).

On the same day of the alleged reprimand, Lee and Brackett "had a few words" in Brackett's office.[84]  At one point during the meeting, Lee "indicated that she was going to take her concerns to the EEO."[85]  In response, Brackett told her that if she did not sit back down he would suspend her for five days without pay.[86]  Although Lee sat back down to finish the meeting, she did go back to the EEO office shortly thereafter.[87]

**Accepting a Lower Position**

Following these incidents, Corless also put two applications on her desk for an open mail clerk position.[88]  Corless also sent co-workers to talk with Lee and encourage her to take the position.[89]  Lee was a Grade 6, Step 2 at the time and she knew if she took the mail clerk job she would be at a Grade 4, Step 10, to preserve her rate of pay.[90]  The position, however, had no potential for upward mobility.  Despite there being no upward mobility, Lee took the position.  Because she

---

[84]  Lee Statement to EEO (May 25, 2005) (Dkt. No. 36-9).

[85]  Brackett, 42:1–2 (Dkt. No. 39-3).

[86]  Lee Depo., Vol. II, 218:11–14 (Dkt. No. 36-6).

[87]  Some inconsistencies exist in the record regarding the timing of when Lee visited the EEO office.  Under one of the versions, Lee did not visit the EEO office until *after* Brackett's alleged reprimand.  Because this is a material fact in dispute, it cannot be resolved on summary judgment. For purposes of the summary judgment motions, however, the court assumes, without deciding, that Lee visited the EEO office *before* the reprimand occurred.

[88]  Lee Depo., Vol. II, 274:10–19 (Dkt. No. 36-6).

[89]  Lee Statement to EEO (May 25, 2005) (Dkt. No. 36-9).

[90]  *See Lee v. Norton*, No. WBR-05-035, 2006 EEOPUB LEXIS 5370, *15 (Aug. 25, 2006) (Dkt. No. 36-12); *see also* Notification of Personnel Action (Effective May 15, 2005) (Dkt. No. 36-3) (stating Lee's pay as a Technician was $31,755 and her pay as a Mail Clerk was $32,031).

"was ready to get out of there," she signed paperwork saying the move was voluntarily.[91]  Lee felt,

though, that she really had no other choice because everyone wanted her to take the job and staying

in the lab was "like going into a fire."[92]  Although she felt pressure to take the job, she acknowledged

that the move, ultimately, "wasn't forced."[93]

**The Bureau's Views**

In contrast to Lee's representations, Brackett testified that within a few months after hiring

Lee, they realized she had exaggerated her qualifications on her resume.[94]  Consequently, they staffed

Lee on less stressful jobs.  According to Brackett, Corless "trained and trained and trained [Lee],"

and he had "never seen [Corless] train a person so hard."[95]  During most of Lee's first year at the

Bureau, it sent another technician with her on jobs to help her learn.[96]

Brackett stated Corless talked loudly because he was hard of hearing.[97]  He did not, however,

observe Corless talk condescendingly to Lee.  Nevertheless, at times Corless would say something

to the effect:  "What don't you understand about it because I've showed you five times or six times?

---

[91]  Lee Depo., Vol. II, 273:19–22 (Dkt. No. 51-3); Lee Depo., Vol. II, 274:20–23 (Dkt. No. 36-6); *see also* Letter from Lee to Manager, Human Resource Division (Apr. 28, 2005) (Dkt. No. 51-5) (stating that the request to change positions was voluntary).

[92]  Lee Depo., Vol. II, 275:6–8 (Dkt. No. 57, Ex. 1); Lee Depo., Vol. II, 276:2–6 (Dkt. No. 36-6).

[93]  Lee Depo., Vol. II, 274:21–23 (Dkt. No. 36-6).

[94]  Brackett Depo., 21:20–24 (Dkt. No. 48-2).

[95]  Brackett Depo., 69:24–70:2 (Dkt No. 36-4).

[96]  Brackett Depo., 22:18–21 (Dkt. No. 48-2).

[97]  Brackett Depo., 70:3–4 (Dkt. No. 36-4).

So tell me what you don't understand about it."[98]  Although Brackett acknowledged that Corless

corrected Lee in front of others, Brackett further testified that Corless did this with the men as well.[99]

Corless also complimented people, including Lee, in front of others.  "[I]t didn't matter to him who

it was in the lab."[100]

Brackett testified that there were problems with Lee's paperwork.  Among other things,

Technicians check soil density, while on a job site, to ensure the soil compaction conforms with

Bureau specifications.  The "paperwork" documents whether a contractor "did the job right or if he's

going to have to spend all this money and rip it out and do it again."[101]  When Technicians perform

tests in the laboratory, results have to be precise because that information is compiled and given to

the design engineer.[102]  Brackett stated that "sometimes [Lee] could do the paperwork, but sometimes

it was so off-the-wall you'd go, like, 'Where did that come from?'"[103]

Brackett said, however, that he "fought for [Lee] a lot."[104]  At times, inspectors asked that

she be removed from a project.[105]  Brackett testified he asked the inspectors to give her a chance

---

[98]  *Id.* at 69:21–70:8.

[99]  *Id.* at 70:12–21.

[100]  *Id.* at 70:21–22.

[101]  *Id.* at 110:4–18.

[102]  *Id.* at 111:3–12.

[103]  *Id.* at 110:1–3.

[104]  Brackett, 25:3–4 (Dkt. No. 44-3).

[105]  *Id.* at 25:4–5; *see also* Brackett Depo., 107:7–10 (Dkt. No. 51-1) (listing names of
inspectors who removed Lee from a job).

because she was still in training. It was apparent, though, that she could not perform well under stress.[106]

Although Lee "passed" each of her performance evaluations, Brackett testified she was nevertheless performing inconsistently and making mistakes often.[107] The performance evaluations were on a pass/fail scale. Brackett did not consider Lee to be a "total failure."[108] Rather, "[i]t was like getting a D on a test."[109] Because Brackett did not think Lee was a total failure, he stated she "passed" her performance evaluations.

When Brackett tried to correct Lee, however, "she would never take an ownership at all of anything she ever did, ever."[110] Brackett asserts he tried to explain to her that when she was being corrected it was not to put her down, but to "get [her] to perform the duties just like the other technicians."[111] According to Brackett, though, she "could not take any constructive criticism at all."[112] She also lied to cover up her mistakes. On one occasion she forgot to take a plate necessary to conduct a density test.[113] The inspector called the Bureau to inform them of it and said "I can't

---

[106] Brackett Depo., 25:22–25 (Dkt. No. 44-4).

[107] Brackett Depo., 78:3–24 (Dkt. No. 39-3).

[108] *Id.* at 78:14–15.

[109] *Id.*

[110] *Id.* at 20:12–13.

[111] *Id.* at 20:19–24.

[112] *Id.* at 20:25–21:1.

[113] Brackett Depo., 84:1–4 (Dkt. No. 51-1).

get a test" because she came without the plate.[114]  When Lee arrived back at the Bureau, rather than admitting her mistake, she told them the project did not need the test.[115]  Because she did this two or three times, Brackett did not trust her.[116]

Brackett did acknowledge that on two occasions he witnessed Lee and Corless arguing.  One occasion was in Fall 2004 and another was in early 2005.[117]  On the first occasion, Brackett told them, "You guys just talk, you don't need to scream at each other."[118]  Brackett testified that was the first time he had ever "heard Corless actually scream at her."[119]  The second occasion involved the dispute about when Lee was supposed to check in while on the Provo River Project.  According to Brackett, Lee screamed and Corless asked her to leave his office because he did not want an argument with her.[120]  Lee responded that she did not have to leave his office because "it was the government's office," not his.[121]  Corless asked her a second time and Lee refused a second time. At that point, Corless "did scream at her to 'please get out of my office.'"[122]

With respect to the mistakes on the Echo Dam samples, Brackett testified it did not involve

---

[114]  *Id.* at 84:6–8.

[115]  *Id.* at 84:17–19.

[116]  *Id.* at 84:21–24.

[117]  Brackett Depo., 17:2–5 (Dkt. No. 39-3).

[118]  *Id.* at 16:23–24.

[119]  *Id.* at 16:25–17:1.

[120]  Brackett Depo., 17:23–18:4 (Dkt. No. 48-2).

[121]  *Id.* at 18:5–7.

[122]  *Id.* at 18:12–14.

just Lee's failure to air dry the eight samples. "The lab was in disarray."[123] This was partly because Lee had not properly labeled and tracked various samples that came in from the project, which is significant because the lab ran hundreds of samples through it.[124] Thus, Brackett called her into his office and did threaten to suspend her.[125] He contends, however, that he threatened suspension not because Lee was going to take her concerns to the EEO, but because of her many mistakes.[126] Brackett also asserts that Lee was insubordinate during the meeting because she "shook her finger at [him]" and told him she no longer had to listen to him anymore because she had filed the EEO complaint.[127] Shortly afterwards, Lee took the mail clerk position.

**Formal EEO Complaint and Determination**

On April 7, 2005, Lee filed a formal complaint with the EEO office. The Bureau's Regional Equal Employment Manager determined that Lee asserted she was "discriminated against based on Sex . . . , Age . . ., and Reprisal when . . . [she was] subjected to a hostile work environment from December, 2000, to the date of subject complaint."[128] Lee was informed by letter to carefully review the claim and to notify the EEO office if her claim was not "properly identified."[129] Lee made no

---

[123] *Id.* at 44:10.

[124] *Id.* at 44:12–45:17.

[125] *See id.* at 43:12–15.

[126] *See id.* at 43:6–17; *see also* Brackett Depo., 46:7–47:6 (Dkt. No. 51-1).

[127] Brackett Depo., 46:17–21 (Dkt. No. 51-2).

[128] Letter from Deborah M. Polak, 1 (June 2, 2005) (Dkt. No. 36-11).

[129] *Id.*

modifications to her complaint.[130]

Following the formal investigation, a final agency decision found no discrimination.[131]  Lee filed an appeal and the Equal Employment Opportunity Commission ("EEOC") reversed the agency's determination.[132]  The EEOC found harassment based on sex and age and also retaliation.[133]  Lee then brought her action in this court seeking civil damages for discrimination.

## ANALYSIS

I.   **STANDARD OF REVIEW**

A.   **Summary Judgment**

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[134]  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[135]  "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[136]  The

---

[130]   Polak Decl., ¶ 7 (Dkt. No. 36-8).

[131]   *See Lee*, 2006 EEOPUB LEXIS 5370, at *1 (Dkt. No. 36-12).

[132]   *Id.*

[133]   *Id.* at *21.

[134]   *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citing Fed. R. Civ. P. 56(c)).

[135]   *Id.* (citation omitted).

[136]   *Id.* at 972 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

evidence and all reasonable inferences that may be drawn therefrom are construed "in the light most favorable to the nonmovant."[137]

## B. EEOC Findings

Lee obtained a favorable ruling before the EEOC. Nevertheless, the United States Court of Appeals for the Tenth Circuit has recognized:

> If a federal employee has received a favorable determination at the administrative level, he or she is able to go into federal court to *enforce* that order without risking de novo review of the merits. Thus, the employing agency cannot challenge issues decided against it if the plaintiff does not seek de novo review. However, a plaintiff is entitled to a de novo hearing if requested. In such a case, *the district court is not bound by the administrative findings*.[138]

Lee's complaint does not allege that the Bureau has refused to comply with the EEOC's decision. Rather, she alleges the facts anew, asserts new causes of action, and seeks civil and punitive damages for the Bureau's actions. Because Lee has not merely brought an enforcement action, the court's review of the facts and law is de novo, and it is not bound by the EEOC's ruling.

## II. DISPARATE TREATMENT CLAIM

Lee asserts a claim for disparate treatment. She did not, however, include a disparate treatment claim in her EEO charge. Lee was provided notice that if she disagreed with the charge, as drafted, she should notify the EEO office. Lee admits that she did not dispute what the EEO

---

[137] *Id.* (citation omitted).

[138] *Timmons v. White*, 314 F.3d 1229, 1234 (10th Cir. 2003) (quoting *Haskins v. Dep't of the Army*, 808 F.2d 1192, 1199 n.4 (6th Cir. 1987)) (emphasis in original).

office included in the charge.[139]  The Tenth Circuit has stated it is the formal charge that governs.[140]

Because "disparate treatment" was not listed in the formal charge, the United States was not

provided notice and Lee did not exhaust her administrative remedies.  Accordingly, during the

hearing on the parties' cross-motions for summary judgment, the court dismissed Lee's disparate

treatment claim.  That claim is therefore no longer before the court.

## III.    HOSTILE WORK ENVIRONMENT CLAIM

In Lee's first and fifth cause of action, she asserts she was subjected to a hostile work

environment based on her sex and/or age, which are protected classes.  The Bureau does not dispute

that Lee falls within these protected classes.  "For a hostile environment claim to survive a summary

judgment motion, a plaintiff must [also] show that a rational jury could find that the workplace was

permeated with discriminatory intimidation, ridicule, and insult."[141]  A plaintiff must further show

that the discriminatory intimidation, ridicule and insult were "sufficiently severe or pervasive to alter

the conditions of the [plaintiff's] employment and create an abusive working environment."[142]

Notably, not "every insulting or unpleasant remark, even those related to protected status,"

is actionable.[143]  Instead, a hostile environment "generally entails a steady barrage of opprobrious

---

[139]  Plaintiff's Memo. in Opp'n to Def.'s Mot. for Sum. J., 16 (Dkt. No. 44).

[140]  *See Martin v. Cent. States Emblems, Inc.*, 150 Fed. Appx. 852, 856–57 (10th Cir. 2005).

[141]  *Zisumbo v. McCleodUSA Telcoms. Servs.*, 154 Fed. Appx. 715, 725–26 (10th Cir. 2005) (quotation marks and citation omitted).

[142]  *Id.* at 726 (quotation marks and citation omitted).

[143]  *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 Fed. Appx. 914, 922 (10th Cir. 2009).

comments," such that a reasonable person would objectively find the conduct to be hostile or abusive.[144] Besides looking at frequency, other factors to consider include, but are not limited to, severity of the discrimination, "whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance."[145]

## A.    Age Discrimination

In this case, three of the four Technicians were in a protected class due to age. Yet, Lee does not contend that the other Technicians were discriminated against based on age. While a "discrimination claim does not fail simply because an employer does not discriminate against every member of the plaintiff's [class],"[146] the favorable treatment of other class members "tends to undermine" Lee's claim.[147] Morgan is next in age to Lee, but the evidence is devoid of any negative actions or comments directed at Morgan. It is also devoid of any performance problems by Morgan.

Haws is the other Technician in the protected class. While the evidence shows that Haws thought he would become the whipping post if Lee left, it also shows that Haws struggled in his position and did not know if he could do the job. Thus, rather than showing that the Bureau's actions were motivated by an age bias, the evidence shows it was focused on employee performance.

---

[144]  *Id.* at 921–922 (quotation marks, citations, and alteration omitted).

[145]  *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quotation marks and citations omitted).

[146]  *Strickland v. United Parcel Serv. Inc.*, 555 F.3d 1224, 1230 (10th Cir. 2009) (citation omitted).

[147]  *See Pitre v. Western Electric Co.*, 843 F.2d 1262, 1273 (10th Cir. 1988).

Brackett's reference to Lee's crying as a "grandma thing," does not alter this conclusion. Although it is true that a "grandma" is older, the evidence does not show that the phrase was said with animus. Rather, Lee liked Brackett and got along with him.[148] The court therefore concludes that the phrase did not rise to the level of creating a work environment that is so hostile as to alter the conditions of employment.

## B.    Gender Discrimination

As indicated above, "not all harassment creates a hostile work environment."[149] Instead, "a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment *based on gender*."[150]

Lee asserted the Corless's screen saver was offensive because it had half-naked women on it. Lee also asserts that Brackett's repeated statements of "It is a "grandma thing," and testing is similar to making brownies, shows she was subjected to gender-based harassment. This is the only evidence that may be classified as gender-based. Nothing in the record shows, however, that Lee informed Corless the screen saver was offensive. As to Brackett's comments, Lee herself testified that when she did calculations "to find the results," that "[i]t was almost like cooking. There were so many steps, just like in a recipe."[151] Moreover, she readily acknowledged that she got along well

---

[148] Lee Depo., Vol. II, 256:18–24 (Dkt. No. 36-6) (testifying that she "liked Wade. We got along pretty well. He – I hadn't planned on him getting in trouble. The majority of this was between me and Steve.").

[149] *Chavez*, 397 F.3d at 832.

[150] *Id.* at 833 (emphasis added).

[151] Lee Depo., Vol. I, 27:21–23 (Dkt. No. 57-1).

with Brackett. These allegations do not approach showing a hostile work environment based on gender.

Because "gender-neutral harassment" can "bolster a smaller amount of gender-based conduct,"[152] the court turns to Lee's other allegations. The evidence shows that Corless screamed at Lee on two or three occasions and that on one of the occasions Lee thought he was going to hit her. There also is evidence that he humiliated her by correcting her work in front of others or by sending her on a project where she did not know how to do the calculation. The evidence also shows that Corless did not invite her into his office like he did the men, and that Lee experienced other isolating events. Coupled with this evidence, however, is that Corless also corrected the men's mistakes or cheating in front of others. Throughout her deposition, Lee testified that Corless was a bully, that he was controlling, and that treated all of them like children and watched them like criminals.

Lee further testified that Corless and Brackett called people names behind their backs, including men, and that there were a couple of younger men that they treated poorly because they did not like them. Indeed, Lee testified they generally treated people poorly when they did not want them to succeed. Although Lee contends her performance was as good as the men, she was not ACI certified and therefore could not be assigned to certain projects. There also is substantial evidence that Lee had performance issues. Inspectors asked her to be removed from jobs, she failed to follow lab protocols, and she lied about her test results and other issues. While Lee has come forward with evidence to show she received awards and "pass" evaluations, such evidence does not negate the

---

[152] *Chavez*, 397 F.3d at 833.

other performance and insubordination issues that were put into evidence.

Looking at the totality of evidence, it is apparent that Lee experienced an unpleasant environment at times and that Corless may not have thought of Lee favorably. What is lacking in Lee's evidence, however, is a showing that Corless and Brackett's behavior was due to Lee's gender. Even when non-gender-based conduct is combined with the limited gender-based conduct, Lee has failed to come forward with sufficient evidence to show a hostile work environment based on gender. The court notes that "Title VII is not a code of workplace conduct."[153] Employees "may have . . . to withstand colleagues that do not like them, are rude, and may be generally disagreeable."[154] Additionally, it is not the court's function "to mandate that certain individuals work on their interpersonal skills and cease engaging in inter-departmental personality conflicts."[155] While such behavior is unfortunate, it is insufficient to sustain a Title VII claim. The court therefore grants summary judgment in the Bureau's favor on Lee's hostile work environment claim.

## IV.    RETALIATION

Lee contends the Bureau retaliated against her after she made her initial contact with the EEO office and the mediation was held. "Title VII of the Civil Rights Act forbids retaliation against an employee who voices opposition to, or participates in, an investigation or proceeding alleging an unlawful employment practice by his or her federal employer."[156] "[D]irect evidence of retaliation

---

[153] *Id.*

[154] *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1218 (10th Cir. 2008).

[155] *Id.*

[156] *Gorny v. Salazar*, No. 10-8047, 2011 U.S. App. LEXIS 3502, at *5 (10th Cir. Feb. 22, 2011) (citing 42 U.S.C. § 2000e-16) (other citations omitted).

is evidence, which if credited, does not require any inference or presumption to establish that unlawful retaliation motivated an employer's action."[157]  The court finds no direct evidence of retaliation in this case.

When direct evidence is lacking, Lee may prove retaliation through circumstantial evidence. To establish retaliation through circumstantial evidence, Lee must show (1) "she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[158]  If Lee meets this burden, she has established a prima facie case of retaliation.[159]  The burden then shifts to the Bureau "to articulate a legitimate, non-discriminatory reason for the adverse action."[160]  If the Bureau does so, the burden then "shifts back to [Lee] to demonstrate the proffered explanation is pretext."[161]

Lee has met the first prong due to her initial contact with the EEO office and subsequent mediation.  Lee contends she then experienced isolation, threats of a reprimand and suspension, and pressure to take another job that constituted a demotion.  The Tenth Circuit has recognized that

---

[157]  *Id.* at *6 (citation omitted).

[158]  *Aguiar v. Bartlesville Care Ctr.*, No. 10-5002, 2011 U.S. App. LEXIS 1804, at *17 (10th Cir. Jan. 28, 2011) (quotations, citation, and alteration omitted).

[159]  *Id.*

[160]  *Id.*

[161]  *Id.* at *17–18 (citation omitted).

threats can "dissuade[] a reasonable employee . . . from pursuing her discrimination charge."[162] Isolation and pressure to take a demotion also may have a similar impact. The court concludes that a reasonable employee would have considered these actions materially adverse.

As to the third prong, "a causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[163] Here, the adverse actions closely followed Lee's protected activity. This is sufficient to show a causal connection.[164] Lee has therefore made out a prima facie case of retaliation.

The Bureau now has the burden to articulate a legitimate, non-discriminatory reason for its actions. This is an "exceedingly light burden."[165] The Bureau has come forward with substantial evidence to show that Lee had performance issues and may have been insubordinate during her meeting with Brackett following the mediation. The Bureau has thus met its burden of articulating a legitimate reason for its actions.

Lee must now come forward to show pretext. To show pretext, Lee must show the Bureau's articulated "reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder

---

[162] *Faragalla v. Douglas County Sch. Dist.*, Nos. 09-1393 and 10-1433, 2011 U.S. App. LEXIS 604, at *21–22 (10th Cir. Jan. 12, 2011) (citing *Williams v. W.D. Sports. N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007)).

[163] *Williams*, 497 F.3d at 1091 (quotation marks, citation, and alteration omitted).

[164] *See id.* (citation omitted) (stating a "temporal nexus is sufficient to infer" a causal connection).

[165] *Gorny*, 2011 U.S. App. LEXIS 3502, at *11 (citing *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007)) (quotation marks omitted).

could conclude the reasons were unworthy of belief."[166]  At this stage of the litigation, the court must view all inferences in the light most favorable to Lee.  Viewing the evidence in the light most favorable to Lee, it shows that the Bureau knew shortly after it hired Lee that she had exaggerated her skills.  The Bureau also knew she had performance problems and had lied on various occasions.  Yet, it continued her employment for the five years and marked her as "pass" on all her reviews.  Additionally, she had engaged in a screaming match with Corless in 2004 with no repercussions.

Only after she made contact with the EEO office did Brackett threaten to give her a written reprimand for her poor performance and threaten to suspend for her mistakes and insubordination.  Further, there is no evidence in the record to show that Lee was "pressured" to take another job until after the mediation.  Taken together, the court concludes a material fact is in dispute about whether the Bureau's actions were merely pretextual.   The court notes, however, that a fact-finder, who does not have to view the evidence in the light most favorable to Lee, may reasonably conclude that Lee's performance and behavior justified a reprimand, suspension, and demotion on the facts presently before the court.  Thus, neither party is entitled to summary judgment on this claim.

## V.    EQUAL PAY ACT (EPA) VIOLATIONS

Lee further asserts the Bureau violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), because the male technicians were promoted more quickly than her.  Unlike Title VII, "[t]he EPA . . . has been described as imposing a form of strict liability on employers who pay males more than females for performing the same work."[167]   Consequently, the burden-shifting analysis is

---

[166] *Aguiar*, 2011 U.S. App. LEXIS 1804, at *18–19 (quotation marks and citation omitted).

[167]  *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310 (10th Cir. 2006) (citations omitted).

substantially different. First, Lee "must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work."[168] If Lee meets this burden, "the burden of persuasion then shifts to the defendant to prove that the wage disparity was justified by one of four permissible reasons."[169]

The four permissible "reasons are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on any factor other than sex."[170] "[B]ecause the employer's burden in an EPA claim is one of ultimate persuasion, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary."[171] This burden is substantial because it "requires an employer to submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity."[172]

The statute of limitations for the Equal Pay Act is two years, unless a plaintiff shows an employer acted willfully. The United States Supreme Court has stated "willful" means "the employer either knew or showed reckless disregard for the matter of whether its conduct was

---

[168] *Lewis v. D.R. Horton, Inc.*, 375 Fed. Appx. 818, 823 (10th Cir. 2010) (quotation marks and citation omitted).

[169] *Id.* at 823 (quotation marks and citation omitted).

[170] *Mickelson*, 460 F.3d at 1311 (quotation marks and citation omitted).

[171] *Id.* (quotation marks and citation omitted).

[172] *Id.* at 1312 (quotation marks and citation omitted).

prohibited by the statute."[173]  Lee has not alleged or shown the Bureau acted willfully.  Accordingly, the applicable statute of limitations in this case is two years.  Lee filed her complaint on November 27, 2006.  She transferred to her the mail clerk position on or about April 28, 2005.  The relevant time period is therefore between November 27, 2004 and April 28, 2005 when determining if a male was paid differently than Lee.  That five month period is also the relevant period when calculating damages.[174]

Although the disparity of pay and damages had to occur within that five-month period, this does not mean that the court cannot consider facts arising prior to November 27, 2004.  Indeed, "[w]hen an employer is accused of an ongoing practice that began prior to the statute of limitations period, the claim may still be timely under the continuing violation doctrine if a present violation exists."[175]

For purposes of its summary judgment motion, the Bureau has conceded that Lee can establish a prima facie case.[176]  Lee has therefore met her burden and now the Bureau must prove at least one affirmative defense so clearly that no rational jury could find to the contrary.  The Bureau asserts a defense based on a merit system and one based on a disparate factor other than sex.  Before a person may be advanced to a Grade 7, a person must have been at a Grade 6 for at least 52 weeks under the Bureau's merit system.  Lee did not advance to a Grade 6 until May 2004.  Consequently,

---

[173]  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 131, 133 (1988).

[174]  *See Lenihan v. Boeing Co.*, 994 F. Supp. 776, 796 (S.D. Tex. 1998) (citations omitted).

[175]  *Id.* (citation omitted).

[176]  Memo. in Supp. Mot. for Sum. J., 23 (Dkt. No. 36).

the Bureau contends she was not even eligible to advance to a Grade 7 during the relevant time period.

This argument ignores facts that existed prior to the relevant time period. A review of the table above shows that Lee was promoted more slowly than all of the male Technicians. It took seventeen months to advance her from a Grade 4 to a Grade 5. It then took two years to advance her from a Grade 5 to a Grade 6. In contrast, Peaslee advanced from one grade to the next on a yearly basis. Thus, even though he started ten months after Lee, he was eligible for a Grade 7 well in advance of Lee. Even Haws, who likewise struggled as a Technician, was promoted more rapidly than Lee.

The Bureau contends Lee's performance precluded her advancement. Brackett testified that although Lee had passed all of her evaluations, he recorded many notes where he had explained to her where her job performance was deficient. None of those notes, however, were provided to the court. Instead, Lee provided evidence that she received both performance and safety awards. The Bureau further contends, however, that Peaslee was more qualified than Lee. In particular, he had ACI certification. The Bureau has not shown, however, that the ACI certification was required before one can be promoted to a Grade 7. Moreover, it does not explain why Lee's Grade 5 and Grade 6 promotions were delayed.

While the Bureau's proffered explanations of its failure to promote Lee *could* explain the delays, the proffered reasons do not necessarily prove *in fact* the disparities were caused by them. The disparities in promotion eventually resulted in Peaslee surpassing Lee in pay during the relevant time period. The merit system and disparity defenses are not so clear that no rational jury could find

to the contrary.  Neither are they so beyond the realm of possibility, however, to warrant summary judgment in Lee's favor.  The court therefore denies both parties' summary judgment motions on this claim.

## VI.    CONSTRUCTIVE TERMINATION CLAIM

Lee also asserts a claim for constructive discharge based on Utah's Antidiscrimination Act.[177] Although she initially asserted that the federal government has waived sovereign immunity based on the Federal Tort Claims Act ("FTCA"), Lee later admitted the FTCA is inapplicable in this case.[178]  The remedies available to federal employees are different from other individuals.  The Tenth Circuit has held that "[a] federal employee's only avenue for judicial relief from federal employment discrimination is through Title VII."[179]  To the extent Lee "asserts employment-related claims based on conduct distinct from the discrimination and retaliation addressed by Title VII, there is another source of federal preemption: the Civil Service Reform Act of 1978."[180]  Moreover, even if Lee's claims were not preempted by Title VII and the Civil Service Reform Act, Lee has failed to show that the federal government has waived sovereign immunity.  Without such a waiver, Lee cannot assert a constructive termination claim against the Bureau based on Utah law.

During oral argument, Lee offered yet another argument to prevail on her constructive

---

[177]    *See* Utah Code Ann. § 34A-5-101 *et seq.* (2011).

[178]    *See* Reply Memo. in Supp. of Plaintiff's Mot. for Sum. J., 42 (Dkt. No. 55).

[179]    *Belhomme v. Widnall*, 127 F.3d 1214, 1217 (10th Cir. 1997) (citing *Brown v. General Servs. Admin.*, 425 U.S. 820, 828–29 (1976)); *see also Pretlow v. Garrison*, No. 10-6206, 2011 U.S. App. LEXIS 5980, at *6 (10th Cir. Mar. 22, 2011).

[180]    *Pretlow*, 2011 U.S. App. LEXIS 5980, at *7.

discharge claim, namely, the Utah Constitution. The court will not entertain this argument because it was raised for the first during oral argument. The court therefore dismisses this claim.

## **CONCLUSION**

For the reasons discussed above, the court DENIES Lee's motion for summary judgment and her supplemental motion for summary judgment.[181] The court GRANTS IN PART and DENIES IN PART the Bureau's motion for summary judgment.[182] It court grants the Bureau's summary judgment motion on Lee's disparate treatment, hostile work environment, and constructive termination claims. The court denies the Bureau's summary judgment motion on Lee's retaliation and Equal Pay Act claims.

DATED this 5th day of April, 2011.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[181] Docket Nos. 39 and 48.

[182] Docket No. 35.

-33-